## Richmond.

### CREEKMUR v. CREEKMUR AND ALS.

#### APRIL 14.

1. The difference between the effect of a demurrer to evidence and a motion for a new trial founded upon a certificate of the evidence is, that in the former case the demurrant is considered as admitting the truth of his adversary's evidence, and all just inferences to be drawn therefrom by a jury, and as waiving all his evidence, which conflicts with that of his adversary, and all inferences from his evidence, which do not *necessarily* result therefrom; whilst in the latter case, the exceptor waives all of his *oral* testimony, and must succeed, if at all, by showing that the verdict of the jury is erroneous, upon the testimony of the successful party.

2. In 1826 P conveyed to his brother E a tract of land for a nominal consideration, and a few days thereafter E conveyed the same tract to J, a son of P, then eight or ten years old, living with his father on the said land, for a like consideration.     When J arrived at the age of eighteen he was put to the trade of a cabinet maker by his father, and when he arrived at maturity, between 1840 and 1843, married, and afterwards lived separate from his father.     P, the father, resided on the land at the time of the conveyance to E, continued to reside on it, claiming it as his, and exercising complete and notorious dominion over it (once in 1843 against the protest of J, who was denied this right and ordered off the land), until the death of P in 1873.   In 1853 P conveyed to his son J another tract of land, with which J said he was satisfied, and that he no longer claimed the first-named tract.   J lived and died on the tract last conveyed to him.   On the death of P, in 1873, he devised to his son P, Jr., a son by his second marriage, the first named tract.   In an action of ejectment, brought after the death of P and J by the heirs of J against P, Jr., to recover said first conveyed tract—HELD :

   1. P, and those claiming under him, having held continual, adversary and notorious possession of the land under claim of title, with the knowledge and acquiescence of J, for a period beyond the statutory bar, the heirs of J cannot now recover it from P, Jr., the devisee of P.

2. Although a party may enter into possession in privity with the true owner, he may, without first surrendering the premises, dissever such relation, and claim by adverse title.

3. Where possession is originally taken and held under the true owner, a clear, positive and continued disclaimer and disavowal of that title, and the assertion of an adverse one, must be brought home to the true owner before any foundation can be laid for the operation of the statute of limitations; and this was done in this case.

4. Adversary possession must be actual, exclusive, open and notorious, accompanied by a *bona fide* claim of title against that of all other persons, and it must be continued for the period of the statutory bar.

5. A mere naked possession, without a claim of right, no matter how long, never ripens into a good title, but is regarded as being held for the benefit of the true owners.

6. *Quære:* What is *color* of title?

7. The effect of color of title is to fix the character of the occupant's possession, and define its extent and limits. As a general rule, the possession of one who has a *colorable* title, is coextensive with the boundaries of the instrument under which he claims, in the absence of any actual possession by the true owner; whereas the possession of one entering and holding under a mere *claim* of title is confined to the land in his actual occupation.

This was an action of ejectment brought in the circuit court of Norfolk county, Va., by Margaret M. Creekmur and Almira Creekmur, infants under the age of twenty-one years, suing by Edwin H. Creekmur, their next friend, and the said Edwin H. in his own right, against Peter E. Creekmur, to recover the possession of a certain tract of land in said county. The facts of the case are sufficiently stated in the opinion of *Staples*, J. On the trial in the court below, after all the evidence was adduced on both sides, the plaintiffs demurred to the defendant's evidence, in which the defendant was required to join, and the court sustained the demurrer to the evidence, and entered judgment for the plaintiffs for the premises sued for, from which judgment the defendant obtained a writ of *supersedeas* to this court.

*D. J. Godwin,* for the appellant.

*Ellis & Thom,* for the appellees.

STAPLES, J. The decisions of this court have established a wide distinction between the effect of a demurrer to evidence and a motion for a new trial, founded upon a certificate of the evidence. In the latter case, the exceptor waves all his own testimony, which is merely oral, and must succeed, if at all, by showing that the verdict of the jury is erroneous upon the testimony of the successful party. Upon a demurrer to the evidence, the demurrant is considered as admitting the truth of his adversary's evidence, and all just inferences which might properly be drawn therefrom by a jury. He is also considered as waiving all his own evidence which conflicts with that of his adversary, and all inferences from such evidence which do not necessarily result therefrom. *Richmond and Danville Railroad Company* v. *Anderson's Adm'r,* 31 Gratt. 812; 4 Minor's Ins., part 1st, 749. It is obvious that a demurrer to evidence is often a very hazardous proceeding, resulting in a decision different from that which might have been arrived at by a jury. In the case before us the plaintiffs, having demurred to the evidence of the defendant, must submit to the operation and effect of the rule just established.

Applying this rule in the present instance, it appears that, in the year 1826, Peter Creekmur conveyed the land in controversy to his brother Ephraim Creekmur for the alleged consideration of five hundred dollars, the receipt of which was acknowledged in the deed.

It would seem, however, that this sale was purely a fictitious one, probably to evade the payment of debts. This conclusion is much strengthened by the fact that Ephraim Creekmur, the grantee, a few days afterwards, conveyed the land to Joseph Creekmur, a son of Peter Creekmur, at the

Creekmur v. Creekmur and als.

nominal price of ten dollars.   This Joseph Creekmur was
at the time a lad of eight or ten years of age, living with
his father on the land in controversy.   At the age of eight-
een he was put to the trade of a cabinet-maker; between
1840 and 1843 he attained his majority, and, as may be
fairly inferred from the evidence, he was then married
and settled, living thereafter separate and apart from his
father.

His descendants are the plaintiffs in this suit.   Peter
Creekmur resided upon the land in controversy at the time
of the conveyance to his son, and continued to reside upon
it down to the day of his death in 1873.   During all this
time, a period of nearly fifty years, he claimed to be the
owner of the land in fee, and he exercised over it acts of
dominion and ownership, open, notorious and adverse to all
the world.   In the language of one of the witnesses, fully
sustained by the others, " he enclosed the land with a fence,
ditched and otherwise improved the same, built barns and
other out-houses, kept in repair the older ones, and con-
tinued up to the period of his death annually to improve
and cultivate the land."   Joseph Creekmur was fully ap-
prized of the claim of title on the part of his father.   He
not only acquiesced in it, but recognized it, and acted upon
it, for as far back as 1847; he leased from his father a part
of the land and paid rent for it, and on various occasions
he bought timber growing upon it, for his business as cabi-
net-maker, and paid for it.   In 1843, about the time and
after he attained his majority, he made an effort to have
some ditching done upon the land.   His right to do so was
denied by Peter Creekmur, who told him the land was his
property, and not that of the son; that he intended to con-
trol it during his life, and to dispose of it as he pleased at
his death.   He said to his son, " You know it is my land, and
not yours," and closed the interview by indignantly order-
ing the son from the premises.   It does not appear that the

latter ever afterwards called in question the title of his father, or attempted in any manner to disturb or interfere with his peaceable or exclusive possession. In 1853, Peter Creekmur conveyed to Joseph Creekmur another tract of land, known as the "Balune tract," about equal in value to the land in controversy, and the latter then declared that his father had done more for him than for any of his other children, and that he no longer claimed the land in controversy. Joseph Creekmur lived and died upon the land thus conveyed to him, never asserting any claim to the land in controversy. It was left to the descendants, after the death of the father and grandfather, to bring this action. There is no doubt that Peter Creekmur honestly believed that the land justly belonged to him. He acted upon this belief for forty-seven years; and upon his death, in 1873, he devised it to Peter Creekmur, a son by a second marriage, who is the defendant in this suit. This is the case made by the defendant's witnesses. I do not deem it at all necessary to enter into an examination of the testimony adduced by the plaintiffs. That testimony does not in the least detract from the weight this court is required to give to the defendant's evidence. But if the testimony of the plaintiffs' witnesses is to be regarded as in conflict with that of the defendant's witnesses, it must be disregarded upon the well-settled principles applicable to demurrers to evidence.

The facts proved—facts incontrovertible—show an actual, continued, adversary possession of the land in controversy by Peter Creekmur, with claim of title on his part for forty-seven years, known to and acquiesced in by Joseph Creekmur for thirty years after he attained his majority, or at least until the period of his death, and by his descendants after that time. If there be a case in which the grantor may claim by adversary possession against the grantee, this is such a case.

It is not necessary in the present instance to attempt any general definition of what is meant by " adversary possession." It is sufficient to say that, according to the best authorities, a possession to be adverse must be actual, exclusive, open and notorious. It must be accompanied with a *bona fide* claim of title against the title of all other persons, and it must be continued for the period prescribed by the statutory bar. A mere naked possession without a claim of right, no matter how long continued, never ripens into a good title, but is regarded as being held for the benefit of the true owner. In all cases, a *bona fide* claim of title is essential. When, however, the actual occupation of land, accompanied with such claim, continues for the period prescribed by the statute, the effect is to confer title upon the occupant without reference to the original merits of the controversy, and even against the plainest and most convincing proof of a better original title. *Koiner* v. *Rankin's Heirs*, 11 Gratt. 420, 426.

Statutes of limitation are statutes of repose, and they would be of little advantage if they protected those only who could otherwise show an indefeasible title; their operation and effect are to mature a wrong into a right by cutting off the remedy, to shut out all inquiry into the merits of the case, and to award the title to him who has had the possession for the length of time prescribed by the statute. Tyler on Ejectment, 860, 861 ; *Humbert* v. *Trinity Church*, 24 Wend. R. 587, 604.

There is a class of cases which hold that a party who enters into possession in acknowledged subserviency to the title of the true owner, cannot by any act of his impart to his possession an adversary character. Before asserting a title in himself, he must first surrender the premises, and place the owner in the same conditions in which he stood before the possession was taken under his title. A very strong leaning in favor of this doctrine was manifested in

the case of *Clarke* v. *McClure*, 10 Gratt. 305. Judge Allen said: "Where it is sought to make out a title by adverse possession, the possession, as a general rule, should be adverse in its inception." A careful consideration of that case, and that of *Creigh's Heirs* v. *Henson*, 10 Gratt. 231, will show that neither of the judges who delivered the opinions of the court were disposed to commit himself unqualifiedly on the subject. The question may, therefore, be regarded as an open one in this State. Notwithstanding the doubt expressed in these cases, it is now settled, by a great weight of authority, that although a party may enter into the possession in privity with the true owner, he may, without first surrendering it, dissever such relation and claim by adverse title. The trustee may disavow his trust, the tenant the title of his landlord after the termination of his lease, and the tenant in common the title of his co-tenant.

The only distinction between this class of cases and those in which no privity existed, is in the degree of proof required to establish the adverse character of the possession. The rule now is that where possession is originally taken, or held under the true owner, a clear, positive and continued disclaimer and disavowal of title and the assertion of an adverse right, to be brought home to the knowledge of the party, are indispensable before any foundation can be laid for the operation of the statute of limitations. The statute does not begin to operate until the possession, before in privity with the title of the true owner, becomes tortuous and wrongful by the disloyal acts of the occupying tenant, which must be open, continued and notorious, so as to preclude every doubt as to the character of the holding or the fact of knowledge on the part of the owner.

Subject to these plain qualifications there can be no reasonable objection to the law of adversary possession as applied to parties occupying fiduciary relations. *Zeller's Lessee* v. *Eckert*, 4 How. U. S. R. 289, 296; Tyler on Ejectment, 876–7. See Angell on Limitations, 478–486.

That these principles apply to the case of a grantor who continues in possession after the execution of a deed of conveyance, would seem to be clear upon principle and upon authority. The case of *Burhans* v. *Van Zandt*, 7 Barb. R. 91, is directly in point. Say the court: "By the execution and delivery of a deed of land the entire legal interest in the premises becomes vested in the grantee, and if the grantor continues in possession afterwards, his possession is not that of owner, but of a tenant of the grantee. He will be regarded as holding the premises in subserviency to his grantee, and nothing short of an explicit disclaimer of such relation, and a notorious assertion of right in himself, will be sufficient to change the character of his possession, and render it adverse to the grantee. But from the time the grantor explicitly disclaims holding under the grantee, and openly asserts his title to the premises, in hostility to the title claimed under his own previous deed, his possession becomes adverse, even though he knew his title to be bad, and from that moment the statute of limitations will begin to run." A doctrine so just and reasonable in itself, as might be expected, is well sustained by other cases. *Hoyt* v. *Jones*, 31 Wisc. R. 389; *Burkman* v. *Jones*, 54 Wisc. R. 524; *Butler* v. *Phelps*, 17 Wend R. 642; *Jackson* v. *Stiles*, 1 Wend R. 103; *Cramer* v. *Benton*, 4 Lans. R. 291; *Chalfin* v. *Malone*, 9 B. Munroe, 596; 6 Wait's Actions and Defenses, 445–7, 458.

That the present case is directly within the influence of these principles is too obvious to require comment. The facts already adverted to exhibit every feature, every requisite, of an adversary possession imposed by the strictest rules of law in all this class of cases. It may also be remarked that Peter Creekmur never acquired the possession under any contract with the grantee. He was already in possession, and never relinquished it. That possession was never transferred in contemplation of law to the bar-

gainee, because the deed was not founded upon any pecuniary or valuable consideration. Peter Creekmur is, therefore, not within the class of cases which hold that the occupant, having gained the possession by agreement with the owner, shall not be permitted to convert it into a tortuous holding to the injury of such owner.

It has been said, however, that to constitute an adversary possession, there must be color of title, which Peter Creekmur never had after the execution of the deed by him to Ephraim Creekmur, his brother. This objection, if made at all in the cases already adverted to, does not seem to have prevailed in any of them. It may be that both parties treating the conveyance as invalid, the grantor, for all the purposes of an adversary possession, was considered as holding under his original title.

It is impossible to say with any degree of accuracy what is color of title. Upon this subject there is hopeless confusion, as well as irreconcilable diversity of opinion. Color of title has sometimes been held to be that which in appearance is title without being in reality so. Again, it has been held that it matters not how defective the title may be, whether the occupant makes color under a written or a parol contract, or even under no contract at all. Tyler on Eject. 863–4; *McCall* v. *Neely*, 3 Watts R. 69, 72. Without attempting now to describe " color of title," it may be perhaps sufficient to say its effect is to fix the character of the occupant's possession, and to define its extent and limits. As a general rule, the possession of one who has a colorable title is co-extensive with the boundaries of his deed, or other instrument under which he claims, in the absence of any actual possession by the true owner. Whereas the possession of one entering and holding under a mere claim of title is necessarily confined to the land in actual occupation.

It was said by Cowen, J., in the case of *Humbert* v. *Trinity*

*Church*, 24 Wend. 604: "The books require *color of title* by deed or other documental semblance of right in the defendant, only when the defence is founded on a *constructive adverse possession*. But neither a deed nor an equivalent muniment is necessary where the possession is indicated by *actual occupation, and any other evidence of an adverse claim exists*. The muniment is but one circumstance by which to make out an adverse possession. An *oral claim* of exclusive title or any other circumstances by which the absolute owner of land is distinguished from the naked possessor, are equally admissible, and may be equally satisfactory."

In Virginia when a person having a colorable title enters upon a vacant possession, claiming title to the whole tract, his possession is co-extensive with his boundaries. Where he enters without color of title, his possession is necessarily confined to his enclosures. If he is not a mere squatter, but a *bona fide* claimant of the land, to the exclusion of all other parties, paying taxes upon the same, exercising acts of dominion over it as tenant of the freehold, he thereby disseizes the true owner, and acquires an adversary possession to the extent of his actual occupation, which, if continued for the period of the statutory limitation, will ripen into a title, and bar the claim of the real owner. Whether this be called color of title, or color and claim of title, is a matter of no sort of importance, for the owner is disseized by the invasion of his boundaries and the occupation of his property accompanied by an adverse claim of title. His "right of action has accrued," and by the express terms of the statute, he must assert his right of recovery within the period prescribed by the statute. This is the doctrine of the supreme court of Ohio, whose statute of limitation is almost identical with our own. *Lessee of Paine* v. *Skinner*, 8 Ohio R. 159; *Humphries* v. *Huffman*, 33 Ohio R. 395, 403.

Also the supreme court of Indiana, *Bauman* v. *Grubbs,* 26 Ind. R. 419; *Doe* v. *Herrick,* 14 Ind. R. 242.

But we have an authority on this subject much nearer home.   In *Kincheloe* v. *Tracewells,* 11 Gratt. 587, 605, Judge Lee said : "An entry by one upon land in possession, actual or constructive, of another, in order to operate as an ouster and gain a possession to the party entering, must be accompanied by a claim of title.   But it is not indispensable that the claim should be ostensible in the form of a deed or any other writing.   The claim from its nature and character may be wholly independent of any written evidence.   Nor, if the party have a deed or other writing with a specified boundary, is the possession which he may take, and hold necessarily restricted to what shall prove to be within the precise boundary.   He may take and may hold actual possession of land lying outside his true boundary.   Whether he has done so in any particular case, is a question of fact and intention."   From this it will be seen that, according to Judge Lee's opinion, an entry to operate as an ouster must be accompanied with claim of title, which may be wholly independent of any writing.   The claimant may, indeed, go outside of his boundary, and acquire adversary possession of land not included in his colorable title.   Whether he does acquire such adversary possession or not is a question of fact and intention to be decided by the jury.

In the present instance, it is very clear that Peter Creekmur, regarding his deed as inoperative, considered himself as holding under his original title.   Under that title the land was assessed and charged to him upon the commissioner's books, from 1826 to the time of his death in 1873, and during all that time the taxes were paid by him as owner and proprietor.   It seems to me, that according to the strictest rules of interpretation, this constitutes color of title, for color of title is received in evidence for the purpose of showing that possession is adverse.   It has been

Creekmur v. Creekmur and als.

received as evidence, under a void and worthless deed, the question being, whether there is an apparent or colorable title under which the entry is made or the possession held in good faith. Tyler on Ejectment, 870, 972.

It is, however, not necessary to rest the decision upon this latter ground exclusively, although I think it might be done with entire safety.

Upon the whole case, I think the defendant would have been justly entitled to a verdict at the hands of a jury; and upon a demurrer to evidence, he is entitled to the same decision from the court. The judgment of the circuit court must, therefore, be reversed, and a judgment entered for· the defendant.

ANDERSON and BURKS, J's, concurred in the opinion of Staples, J.

CHRISTIAN, J., concurred in the judgment.

JUDGMENT REVERSED.