# Richmond.

WHITLOCK v. JOHNSON.

January 15th, 1891.

87  323
91  400
87  323
97  121
87  323
100  746

87  323
108   88

1. JUDICIAL SALES—*Adverse possession—Statute of limitations.*—Where sale of land under decree is made and confirmed, purchase-money paid, but no deed, and former owner's heirs remain in possession : *held*, the statute of limitations does not begin to run against purchaser until the heirs make distinct disavowal of his title, and their assertion of adverse claim is brought home to him. *Creekmur* v. *Creekmur*, 75 Va., 436.

2. IDEM—*Irregularities—Title.*—Failure of such purchaser to take deed from commissioner and to give trust deed for deferred payments, is irregular, but not such as to vitiate his title.

3. PURCHASER FOR VALUE WITHOUT NOTICE.—With report of sale was filed a plat of the land sold. Deeds for same, to intermediate purchasers, mentioned that plat. Deed to defendant refers to those deeds. Defendant's agent to examine the title, by the deeds, was referred to the plat and the report of sale, and inspection thereof must have given him notice of the plaintiff's rights therein: *held*, the defendant is affected with constructive notice of the outstanding title of the plaintiff.

4. LACHES—*Case at bar.*—The doctrine of laches does not apply to the case made here by the record.

Appeal from decree of chancery court of city of Richmond, rendered February 7th, 1889, in a cause entitled "*Johnson et al.* against *Whitlock et al.*" The decree being adverse to the complainants, they appealed. Opinion states the case.

*H. G. Cannon* and *L. Page,* for the appellants.

*W. W. & B. T. Crump* and *Wm. Ellyson,* for the appellee ∴.

HINTON, J., delivered the opinion of the court.

After a careful examination of this record, we find that the opinion of the learned chancellor, the late Hon. Edward H. Fitzhugh, who decided the case in the court below, and whose opinion is made a part of the record, so clearly expresses the views of this court that we adopt it as our own.

That opinion reads as follows:

"From the pleadings and evidence in this cause it appears that in June, 1853, Dr. Carter P. Johnson, the ancestor of the plaintiff, bought at a judicial sale the lots No. 25, 26 and 27, which are the subjects of this controversy. The sale to Johnson, with other sales, was confirmed by the decree of the county court of Henrico county on the 9th day of August, 1853, in the record of the matter *ex parte* of A. E. Peticolas, a lunatic, then pending in that court.

That record shows that Johnson paid the cash instalment required by the decree of sale, and gave his bonds for the deferred instalments, also according to that decree, and thus far complied with the terms of sale.

It further appears from the decree of August 9th, 1853, that Watson, the com'r, was empowered and directed to execute proper deeds of conveyance to the purchasers who have complied with the terms of sale, for the property purchased by them respectively, and to take from each a deed of trust to secure the deferred payments. And the com'r was directed to report his proceedings to the court, 'which shall be subject to the confirmation of the court.'

It seems no deed was made to Johnson and he gave no deed of trust.

From the evidence in this cause, I think it may be fairly assumed that Johnson in his lifetime, and his personal representative after his death, paid the whole purchase money in full.

It has been seen from the record above referred to that he paid the cash instalment, which was $306.67. From the records of the settlement of the estate of Johnson after his death it appears that on the 20th of June, 1855, his administrator paid 'Dr. Peticolas's bond for real estate—3d instalment—$228.96.' That on the 8th of August, 1850, the administrator of Johnson paid 'Dr. Peticolas's bond, with interest—last instalment—$260.97.'

There is no direct evidence of the payment of the second (which was the first deferred) instalment.

The bonds for the deferred instalment was deposited with the clerk of the county court of Henrico, and from the record above referred to it appears that Edward F. Peticolas had died, and that Arthur E. Peticolas had qualified as his administrator, and by an order made March 8th, 1854, the clerk was ordered to deliver the bonds for the deferred payments aforesaid to Peticolas, the adm'r, and among them three bonds of Carter P. Johnson for $204.44, $204.44, and $204.45. These were the three deferred instalments of purchase-money.

The second instalment (being the first deferred instalment) of $204.44, was due on the 14th day of June, 1854. In that month Johnson sailed for Europe. It is very probable that he paid the first bond when it became due or about that time, and before he left for Europe. But however that may be, Johnson's estate was solvent and abundantly able to pay that debt, as fully appears from the settled accounts of the adm'r of his estate These accounts show very considerable receipts and disbursements, and in 1861 a balance of $3,459.56 due the estate by the adm'r. Under these circumstances it is fair to assume that the second instalment or first bond was paid, as the second and *this* bond were. For the administrator had the bonds—it was his duty to collect them. Johnson's estate was

solvent and able to pay, and no such bond has been asserted to be outstanding and unpaid.

When the sales of these lots to Johnson by Com'r Watson, under the decree of the county court of Henrico, was confirmed by the decree of August 9th, 1853, there was a completed contract of sale. In *Langyher, Trustee,* v. *Patterson, &c.,* 77 Va., 473, Fauntleroy, J., speaking for the whole court, said : " Confirmation is the judicial sanction of the court, and by confirmation the court makes it a sale of its own ; and the purchaser is entitled to the full benefit of his contract, which is no longer executory but executed, and which will 'be enforced against him and *for him."*

See also to same effect *Terry* v. *Coles, &c.,* 80 Va., 702–'3. When the sale was thus confirmed by the court Dr. Johnson became in equity the owner of the land, with a lien resting upon it for the purchase-money. He had an equitable estate, and when he and his personal representative after his death had paid the purchase-money in full, the plaintiffs, as his heirs-at-law, acquired a complete equitable title to the three lots in question ; that is, the right to call for the legal title in absolute fee simple. (*Hunt* v. *Jones,* 75 Va., 347.)

Then the question arises, What has occurred to divest the plaintiffs of his complete equitable title and his right to demand the legal title ?

It is claimed by the defendants' counsel that the plaintiffs' right to recovery is barred by the statute of limitation.

I do not think so.

As soon as a valid contract for the sale of land is made, equity, which looks upon things agreed to be done as actually performed, considers and treats the vendor as a trustee for the purchaser of the estate sold, and the purchaser as a trustee of the purchase-money for the vendor, and a contract for sale under a decree in chancery is governed by the same principles, (*Hurt* vs. *Jones,* and *supra,* pp. 346, 347.

Now, in this case, Arthur E. Peticolas, as the committee of

his lunatic father, Edward F. Peticolas, on his own petition, through the agency of a court of competent authority, caused the three lots in question to be sold to Johnson, and in the decree of August 9, 1853, consented to the confirmation of the sale, and, through the officer of the court, and in person, received the purchase-money in full. Under such circumstances, according to the rule just cited, the vendor, and his heirs after him, held the property as trustee for the vendee, Johnson, and his heirs, and such holding of the lots by the vendor and his heirs was not an adverse possession, but was a holding as trustee for the vendee, and in subordination to a subsisting admitted title in him and his heirs. The title in Johnson was admitted by the consent to the decree of confirmation, and afterwards by the receipt of the purchase-money. In such case a clear, positive, and continued disclaimer and disavowal of title in Johnson and his heirs, and the assertion of an adverse right, brought home to the knowledge of Johnson or his heirs, are indispensable before any foundation can be laid for the operation of the statute of limitation. *Creekmur* v. *Creekmur*, 75 Va., 436.

This assertion of an adverse right was never made or brought home, directly or indirectly, to the plaintiffs, until the conveyances to Reddy and Ullman, in 1884. And it seems that for many years—certainly since 1857—the land in question has been an open common, over which cattle ranged and grazed at will, and there have been, prior to 1884, no such visible acts of ownership as from their nature indicated a notorious claim of property in the land by Peticolas or his heirs. See *Turpin* v. *Saunders*, 32 Gratt., 34; *Hollingsworth* v. *Sherman*, 81 Va., 671.

The principle which applies where a grantor makes a deed and continues in possession, I think, is applicable here. Johnson bought and paid for the lots, and was entitled to his deed. The continued possession by Peticolas and his heirs, even if it was as continuous and uninterrupted as is claimed by counsel

for defendants, was a possession of precisely the same nature as that of a man who had made a deed and still remained in possession. In such circumstances, in *Creekmur* v. *Creekmur*, *supra*, it was held :

'He will be regarded as holding the premises in •subserviency to his grantee, and nothing short of an explicit disclaimer of such relation, and a notorious assertion of right in himself will be sufficient to change the character of his possession and render it adverse to the grantee.'

The statute only begins to run, and his possession only becomes adverse, from the time of such notorious assertion of right in himself. In this case no such assertion was made until the conveyance in 1884.

Again, the confirmation of the sale of such as was made in this case belongs to that class of contracts partaking of the nature both of executory and executed contracts. (See Story on Contracts, sect. 19.) So far as the sale was concerned, it was a completed and executed contract. But there was something else to be done. The deed and deed of trust had to be executed and the deferred instalments of purchase-money to be paid. In that respect it was executory, and was especially so in this case from the facts that the commissioner was required in the decree of August 9th, 1853, to report his proceedings in relation to the deed and deeds of trust to the court for confirmation by it. The contract, therefore, in this regard was executory until the deeds were made, and it has been held that 'when the contract is executory, * . * * and the legal title is left with the grantor for future conveyance, the privity between the parties forbids the idea of adverse holding.' (*Nowlin* v. *Reynolds*, 25 Gratt., 143.) I think the legal title in these lots remained in Edward F. Peticolas after the sale. After his death it descended and passed to Arthur E. Peticolas, his son and only heir-at-law, and, at his death, to Mrs. Gorman, the only child and heiress-of-law of Arthur E. Peticolas, and the legal title is now in Mrs. Gorman.

There is no satisfactory evidence (at least to my mind) as to
who had the actual possession of the three lots in question in
the interval between the sale and conveyances to Reddy and
Ullman, in 1884  They were parts of an open, unimproved,
uncultivated old field, with no visible notorious marks or
evidences of possession in anybody.   And, in fact, it seems to
me that there was no evidence of actual possession by Petico-
las and his heirs, between the time of the sale, in 1853, and
the deeds, in 1884, than there was in Johnson and his heirs
during the same period.   Before the sale the elder Peticolas
undoubtedly had the legal title and possession.   After the sale
was confirmed, Johnson had the right to the possession.
(*Hudgins* v. *Merchant & Co.*, 28 Gratt , 182.)   And, in the ab-
sence of evidence to the contrary, the court will not presume
that Peticolas and his heirs withheld from Johnson and his
heirs the possession of which they were entitled.   I think
there is no satisfactory evidence that they did so until 1884,
when, by the conveyances of Reddy and Ullman, they did set
up an open, notorious, adverse assertion of right in themselves.
I think, therefore, that the statute only began to run from 1884.
But, if it be assumed that the possession of Peticolas and his
heirs was as continuous and uninterrupted as they contend,
then, for the reasons above stated, I am of opinion that such
possession during the interval above mentioned, was not ad·
verse, but was a holding for, and in subordination to the title of
the grantee, Johnson and his heirs, and not adversely to them,
and so that the statute of limitation did not run.   I at-
tach no importance to the fact that since 1871 the property in
question was listed on the land books in the name of Peticolas.
The witness, W. H. Talman, shows that this was done by the
proper officers in the discharge of their duty, without the in-
tervention of any party to this cause, and by the officers them-
selves on their own volition.   Again, the objection is made by
defendants' counsel that Johnson gave no deed of trust.   It is
by no means clear that Johnson was in default in failing to

give a deed of trust. It is true that the decree of sale of May 7th, 1853, did require purchasers to give a deed of trust to secure the deferred payment of purchase-money. But the decree of August 9th, 1853, confirming the sale, prescribed when the deed of trust should be given—namely, when Watson, the commissioner, made a deed for the property brought.

Johnson was not required to give a deed of trust until he received a deed for the property. That deed was not made to him, and therefore, he did not, and could not, make the deed of trust. Watson, the commissioner was in default, but it is by no means clear that Johnson was. The failure to make the deed and deed of trust was an irregularity, but not such an irregularity as to vitiate Johnson's title. Even if it be assumed that it was Johnson's duty to have taken measures before the court to coerce Watson, the commissioner, to make him a deed, so that he could have given a deed of trust, yet, inasmuch as the purchase-money was all paid, and the purpose of which the deed of trust was designed—namely, the payment of the purchase-money—was fully accomplished, the irregularity was cured, and Johnson's title was not affected and was not vitiated. The question of notice is raised in this cause. The defendants, who were purchasers of the lots in question, contend that they were innocent purchasers for value, without notice, either actual or constructive.

The deed from Mrs. Peticolas and Gorman and wife to James V. Reddy, dated respectively June 24th, 1884, and September 23d, 1884, and the deed from the same parties to Emanuél Ullman, dated June 24th, 1884, and the deed from Ullman to said Reddy, dated 1st October, 1884, all contain a clause in the same words, referring to the several lots conveyed thereby as referred to 'in a plat of the sub-division of E. F. Peticolas's estate, which plat is filed with the report of Commissioner W. F. Watson, in the clerk's office of the county court of Henrico, with the causes ended October, 1861.'

The deed from Reddy and wife to Whitlock contains no

direct reference to the plat or to Watson's report, but specially referred to the foregoing deeds. But Mr. Whitlock had the title to the lots examined. He employed Mr. John A. Meanley to make the examination. Meanley's deposition has been taken. He refers to his abstract. The paper shows undoubtedly that Meanley saw the record in the county court of Henrico in the matter *ex parte* A. E. Peticolas 'for the sale of the land of E. F. Peticolas, a lunatic. For he makes statements of matters in his abstract that he could have gathered from no other source than from that record.

The law on this subject is well settled. ' Whenever enquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself.' (*Effinger* v. *Hall*, 81 Va., 106, and authorities there cited.)

Each one of the purchasers of these lots were put by their deeds on enquiry. The plat referred to has the name 'Dr. C. P. Johnson' on lot No. 25, and the word ' do.' on each of the other lots, and by the plat and the deeds they were put upon enquiry as to the report of Com'r Watson, for the plat was a part of that report. That report showed conclusively that Johnson was the purchaser of these lots. It is true the cause in which the report and plat are filed is not named in the deeds. But the term of court in which the report and plat are filed as part of an ended cause is given, and on the face of the plat, to which reference is specifically made in the deed, the name of the cause in which the sales of property shown by the map is particularly and fully set forth. And it is apparent that Meanley had no difficulty in laying his hand upon the ended cause in which the report and plat were filed. So that the clauses in their deed which pointed to the plat gave them all needed information as to where the plat and report and ended cause could be found, and did so as effectually as if the ended cause itself had been named.

Meanley was the agent of Whitlock in this particular trans-action. He was employed to examine the title to these parti-cular lots. He saw the record of the sale and confirmation of the sale of these lots. He was mistaken in his conclusion as to the contents of the record, and misled Whitlock. But that was his misfortune. He cannot now make the plaintiffs bear the burden of the mistake of his own agent.

Notice to the agent is constructive notice to the principal. On proof of notice to an agent, the law at once imputes notice to the principal; not because notice to the agent is not proof that the principal actually had notice also, but because it is a fact of such a character that the principal ought to be as much bound by it *as if he had notice*. (*Easley* v. *Barksdale*, 75 Va., 283; 2 Minor's In., 889, 2d edition.)

For these reasons I am of opinion that Reddy and Ullman and Whitlock, and each of them, were affected with construc-tive notice of the outstanding title of the plaintiffs to the lots in question, and were not purchasers for value, without notice. I do not think that either of these purchasers had actual notice or any personal knowledge of the matter, but only such knowledge as the law imputes, without regard to their actual personal knowledge.

I do not think the plaintiffs have been guilty of *laches*. They were very young when these transactions occurred. The untimely death of Dr. C. P. Johnson and of Gifford, his ad-ministrator, deprived them of the persons who had an interest in protecting their rights, and who could have informed them what they were. While in their minority they were removed beyond the limits of the State, and for a great part of their minority lived abroad. After becoming of age they led wand-ering lives—one as a teacher, the other as an engineer—and almost the whole time in other States than Virginia. They had no connections or correspondents here, and were utterly ignorant of their rights until a short time before institution

of this suit. As soon as they were informed of their rights, they took active and vigorous measures to enforce them.

The evidence in this case is mostly documentary, and so accessible that counsel had no difficulty, it seems, in agreeing the facts upon which the case turns.

Nothing had, by lapse of time or *laches*, become obscure.

There is no room for conjecture. The pathway to a full and fair ascertainment of the rights of the parties is open and plain, with no obstruction to the attainment of complete justice. Under such circumstances the doctrine of *laches* does not apply. (*Wisler* v. *Craig*, 80 Va., 30.)

In January, 1886, Mrs. Peticolas and Gorman and wife conveyed to the plaintiff, C. P. Johnson, three lots, Nos. 18, 19, and 20 in said plat, for $150. These three lots were a part of the purchase by Dr. C. P. Johnson in 1854, and are separated from lots 25, 26, and 27 by an alley. It is contended by defendants' counsel that this deed is an admission by plaintiff, C. P. Johnson, that the legal and equitable title to the whole property purchased in 1853 was in the grantors, Mrs. Peticolas and Gorman and wife. But the whole matter is fully and satisfactorily explained by Wm. Johnson in his deposition. He wanted to sell lots 18, 19, and 20, and in June, 1886, did sell them to John Mahoney for $1,500, and he was willing to give $150 to Mrs Gorman and her mother to enable him to convey a clear title to Mahoney. The transaction has, I think, no bearing on the matter in dispute in this cause.

After a careful consideration of the whole case I am of opinion—

1st. That the demurrers be overruled.

2d. That the deeds from Mrs. Peticolas and Gorman and wife to Reddy and to Ullman, and from Ullman to Reddy, and from Reddy and wife to Whitlock, be set aside and annulled.

3d. That a special commissioner be appointed to convey lots 25, 26, and 27 to plaintiffs.

4th. Plaintiffs shall pay taxes accrued and paid by defendants, or any of them.

That plaintiffs recover costs against defendants, and decree may go accordingly."

Therefore, for the reasons assigned in the foregoing opinion of the late chancellor, we are of opinion that there is no error in the said decree, and that the same must be affirmed.

DECREE AFFIRMED.