# Staunton

## MARION INVESTMENT COMPANY V. VIRGINIA LINCOLN FURNITURE CORPORATION.

September 9, 1938.

Present, Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*S. B. Campbell* and *George P. Young,* for the plaintiff in error.

*L. Preston Collins* and *Wm. A. Stuart,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

This is an action in ejectment instituted by Marion Investment Company against Virginia Lincoln Furniture Corporation, involving the title to a lot of land in the town of Marion. The parties will be referred to as they appeared before the court below.

The plaintiff traced its title to the land in controversy, through mesne conveyances, to the Commonwealth. The defendant offered evidence to prove that it had acquired title to the property by adverse possession. The plaintiff demurred to the defendant's evidence, and there was a verdict for the defendant subject to the demurrer. On the demurrer to the evidence the court entered a judgment for the defendant, to review which this writ has been granted.

It is conceded that the property in controversy is correctly described in the final judgment; hence, that description need not be set out here. Suffice it to say that the land fronts approximately twenty-seven feet on the southern side of Gilmore street, and runs back southerly to a depth of a little more than forty-six feet, with a width in the rear of 31.5 feet. It is bounded on the west and south by property of the defendant, and on the east by property of the plaintiff.

The rear or southern portion of the land in dispute, being roughly one-third of the whole, with a width of 31.5 feet and a depth of 13.5 feet on the east and 13.2 feet on the west, is now and has been occupied, since 1907, by a portion of the large furniture factory of the defendant.

The remaining or northern portion of the land fronts twenty-seven feet on the southern side of Gilmore street, and runs back southerly between parallel lines a distance of thirty-three feet to the northern line of the defendant's factory located on that portion of the land in dispute just described. To the west of this open lot is the office building of the defendant company. A concrete walkway borders the lot on the other three sides. In the center of the lot is a concrete fountain base. While this part of the land is unenclosed and is not occupied by any building of the defendant, it has been in actual, exclusive, continuous, open and notorious possession of the defendant and those through whom it claims since about 1917.

The record shows that the property here involved was formerly owned by the Marion & Rye Valley Railway Company, the track of which ran approximately north and south, about fifteen feet east of the defendant's factory. The passenger station of the railway company was located east of the railway track and just opposite to and close by the land in dispute. The freight station was formerly located on the northern part of the land in controversy, but was later moved across Gilmore street under the circumstances hereinafter related.

On January 1, 1902, the Marion & Rye Valley Railway Company conveyed all properties then owned or thereafter to be acquired by it to the Radford Trust Company, trustee, to secure a bond issue of $175,000. While the land here involved was not at that time owned by the railway company, the defendant concedes that the trustee acquired good title thereto when the land was afterwards acquired by the railway company in 1904.

Subsequently a chancery suit, under the style of *Floyd L. Knight, Trustee* v. *Marion & Rye Valley Railway Company*, was instituted in the Circuit Court of Smyth county for the purpose of foreclosing the deed of trust. In due course Floyd L. Knight, trustee, was authorized to advertise for sale all of the property, real and personal, of

the railway company. R. E. Scott and F. Sitterding became the purchasers.

While the record shows that by a decree entered on May 7, 1923, the sale was confirmed, the purchase price was paid in full and properly disbursed, and the purchasers took possession of the property acquired by them, for some unknown reason Floyd L. Knight, trustee, either failed to execute and deliver a deed to Scott and Sitterding, or, if such deed was executed and delivered, it was never properly recorded. Accordingly, on February 27, 1933, a decree was entered in the same chancery cause reciting these facts and appointing R. Crockett Gwyn a special commissioner to execute and deliver a deed for the property to R. E. Scott and F. Sitterding. This deed was dated March 2, 1933, and was recorded in the clerk's office on May 5, 1933.

By deed dated March 14, 1933, the Marion Investment Corporation acquired all title and interest of Scott and Sitterding in and to the property which had formerly belonged to the Marion & Rye Valley Railway Company.

As has already been stated, the southern portion of the land in controversy is actually covered by a portion of the defendant's factory, and this condition has continued since 1907. Not only did the defendant at that time erect a valuable building upon this part of the land, but ever since that date it has openly, notoriously and continuously carried on there its manufacturing operations. This was done in full and close view of the railway company from 1907 to 1923, of Scott and Sitterding from 1923 to 1933, and of the Marion Investment Company from 1933 until this suit was instituted in 1936.

The defendant's possession of the remainder of the land in controversy commenced in 1916 or 1917. It proved that it was verbally agreed between J. C. Campbell, deceased, formerly president of the railway company, and C. C. Lincoln, likewise deceased, and formerly president of the Virginia Table Company, one of the defendant's predecessors in title, that if the Virginia Table Company would move, at its own cost and expense, the freight station which

then occupied the northern portion of the land in controversy across Gilmore street to a lot there owned by the railway company, the latter would deed to the Virginia Table Company the lot which had been so vacated.

Pursuant to this agreement the Virginia Table Company moved the building, but the deed from the railway company was never executed and delivered. Nevertheless, the Virginia Table Company immediately took possesion of the lot from which the building had been removed, graded and improved it, and it and its successors have continuously from that time been in actual, open, notorious, and exclusive possession of this parcel of land.

The plaintiff concedes that the evidence is sufficient to show that the defendant and its predecessors in title have been in actual, open and notorious, exclusive, continuous and uninterrupted possession of the land for the ten-year period required by Code, section 5805. If, therefore, such possession was hostile and under a claim of right or claim of ownership, the defendant has acquired title to the property by adverse possession. *Creekmur* v. *Creekmur*, 75 Va. 430, 435; *Yellow Poplar Lumber Co.* v. *Thompson's Heirs*, 108 Va. 612, 623, 62 S. E. 358; *Radford Veneer Corp.* v. *Jones*, 143 Va. 124, 128, 129 S. E. 260; Graves' Notes on Real Property, sec. 139; 2 Minor on Real Property (2d Ed.), sec. 955, p. 1220.

But the plaintiff earnestly insists that the evidence fails to show that the possession of the defendant and those through whom it claims was hostile to the plaintiff's predecessors in title for the required statutory period.

As to that portion of the lot from which the freight station was removed, the plaintiff argues that the undisputed evidence shows that the occupancy by the defendant's predecessor in title commenced in 1916 or 1917, pursuant to the parol agreement entered into between C. C. Lincoln and the president of the railway company, and that such occupancy and possession was, therefore, with the permission of and not hostile to the railway company and its successors in title. The plaintiff further argues that, even if

it be granted that the statute of limitations (Code, section 5805) ran against the mortgagor (the railway company) before foreclosure, it did not run against the mortgagee (the trustee) because, under the express terms of the mortgage, the latter had no right of possession of the premises and, therefore, no right to dispossess the occupant.

The plaintiff further contends that, in no event, did the statute of limitations commence to run against the purchasers at the judicial sale (through whom the plaintiff claims title) until such purchasers had actually obtained their deed in 1933; for, it says, not until then did the purchasers have legal title to the property, and not until then were they in a position to eject the occupant from the premises. This reasoning, if sound, applies to the whole property in controversy.

We think that both parcels of the property in controversy are in the same situation in determining whether the defendant has acquired title thereto by adverse possession.

When the purchasers at the judicial sale paid the purchase price in full, and the sale was confirmed and they became entitled to a deed, in 1923, all interest of the railway company in the property terminated. Thereafter it can not be said that the Virginia Table Company held under the railway company that portion of the property from which the freight station had been removed. Nor is there any contention that the table company ever held it with the permission of the purchasers at the judicial sale. On the contrary, the table company's holding must have been adverse to the rights of such purchasers from the time that the latter purchased the property.

As to the remaining portion of the property, when the purchase price was paid in full and properly distributed, as the record shows, the bondholders had no further interest in the land. While the trustee held the bare legal title to the land, it had no real interest therein. The purchasers at the judicial sale became the equitable owners of the land and were entitled to a deed thereto as a matter of right. As to this part of the land, there is likewise no contention

that the table company held it with the permission of the purchasers at the judicial sale, and consequently its holding of this part of the land was likewise adverse to the rights of such purchasers.

The real question to be decided then is, did the statute of limitations commence to run against the purchasers from the time the latter became entitled to a deed in May, 1923, or did it commence to run only from the time the purchasers actually received their deed in 1933?

In 2 C. J. S., Adverse Possession, section 162, page 735, the author says: "Statutes of limitations governing actions for land adversely possessed will not begin to run until claimant takes possession in fact under color of title or claim of right where such requirements prevail, and a cause of action therefor accrues. In other words, limitations will not commence to run against the owner until he is in such a position that he can protect his title by appropriate proceedings, that is, he must have a right which can be invaded with the necessity cast upon him to protect it, and when this necessity arises the statute will commence to run."

The authorities are not in accord as to how these principles should be applied to a purchaser at a judicial sale who has paid the purchase price in full and is entitled to but has not received a deed. Some of the cases hold that since such purchaser has it in his power to obtain a deed without delay, and to protect his interest in the property by appropriate proceedings, there is no good reason why the statute should not commence running against him from the time he is entitled to a deed.

On this reasoning in *Chalfin* v. *Malone,* 9 B. Monroe (48 Ky.) 496, 50 Am. Dec. 525, it was held that the statute of limitations begins to run against a purchaser at an execution sale of land from the time of the purchase, and not from the date of the sheriff's deed ten years later. The court there said (at page 497): "Having it in his power to obtain a deed without delay, which deed, by relation, invests him with the title from the time of the purchase, and

for some purposes, extends beyond that period to the time of the levy, there seems to be no good reason why the statute of limitations should not commence running against him from the time of the purchase. The doctrine, if established, that the statute does not commence running until the execution of the sheriff's deed, might result in the most pernicious consequences to the rights of innocent purchasers, and to the general security of titles to real estate. A purchaser at sheriff's sale might not consummate his purchase, by deed, for half a century, and although, in the meantime, the property may have been held adversely, and passed from hand to hand through successive conveyances, without any knowledge or suspicion of a defect in the title, yet, when the sheriff's deed is procured, the title of the purchaser would exist in all its vigor, unaffected by an adverse holding of fifty years, so far as the statute of limitations might be relied upon for the purpose of defeating it. We can not sanction a principle which would result in such mischievous consequences, and tend so greatly to disturb the security of titles to landed property."

*Keaton* v. *Thomasson's Lessee,* 2 Swan (32 Tenn.) 138, 58 Am. Dec. 55, is to the same effect.

In *Pratt* v. *Pratt,* 96 U. S. 704, 708, 24 L. Ed. 805, it was held that the statute of limitations began to run against a purchaser at a judicial sale when the latter became entitled to a deed. See also, *Norris* v. *Ile,* 152 Ill. 190, 38 N. E. 762, 767, 43 Am. St. Rep. 233.

On the other hand, in California the rule is that the statute of limitations begins to run against a purchaser at a foreclosure sale from the date of the delivery of the deed, and not from the date of the confirmation of the sale. This is on the theory that not until the purchaser has actually received his deed is he in a position to protect his rights by an appropriate proceeding. See *Jefferson* v. *Wendt,* 51 Cal. 573; *Leonard* v. *Flynn,* 89 Cal. 535, 26 P. 1097, 23 Am. St. Rep. 500, 504; *McDonald* v. *McCoy,* 121 Cal. 55, 53 P. 421; *Comstock* v. *Finn,* 13 Cal. App. (2d) 151, 56 P. (2d) 957. In the case last named the opinion concedes that

there are both sound reasoning and respectable authority for the contrary holding.

The question has not been previously decided by this court. It was presented but not decided in *Whitlock* v. *Johnson,* 87 Va. 323, 12 S. E. 614.

*Evans* v. *Spurgin,* 6 Gratt. (47 Va.) 107, 52 Am. Dec. 105, relied on by the plaintiff, is not controlling. That was a suit brought to subject land to the lien of a debt. The commissioners sold the land and conveyed it to the purchaser, but the sale was never reported to or confirmed by the court. The original lien debtor, Daniel Lantz, and those claiming under him remained in possession of the land. It was held (at page 118) that such continued possession of Lantz and those claiming under him was not adverse to the purchaser, "because the decree of the court confirming said deed was essential to the validity thereof, and because until such final order, the said Daniel Lantz and those claiming under him, held subject to the control of the court, under and in virtue of said title, and not adverse thereto."

In the instant case the purchase price was paid in full, the sale was confirmed, and the court authorized and directed the execution and delivery of the deed to the purchasers by a decree entered in May, 1923. In the deed dated March 2, 1933, and subsequently delivered to the purchasers, it is expressly recited that either no deed had been previously executed and delivered to the purchasers, or, if executed and delivered, it had never been recorded.

Certainly, if the deed was delivered when the sale was confirmed in 1923, the purchasers and those claiming through them are not in a position to complain of their negligence in failing to record it. By merely recording this deed the purchasers could have perfected their legal title to the property and could have obtained possession of the premises.

If, on the other hand, the deed was not already in the purchasers' possession, it could have been obtained for the mere asking, since the sale had been confirmed and the purchase price had been paid in full. In other words, the

purchasers were in a position to perfect their legal title to the property and to recover possession thereof.

Moreover, all of the interest of the railway company, which had given permission to Virginia Table Company to occupy a portion of the property, ceased upon the confirmation of the sale and the payment of the purchase price. Thereafter the purchasers were the equitable owners and entitled to immediate possession of the property. Indeed, the evidence shows that in 1923 they took possession of all of the other property which they had acquired at the sale. For three years thereafter these same purchasers operated the railroad. The track ran within a few feet of the property in controversy, and both the freight and passenger stations were located a short distance therefrom. It is a fair inference to be drawn from the evidence upon a demurrer thereto that these purchasers saw that the land here in controversy was in actual and exclusive possession of the defendant's predecessor in title. Had the occupant refused possession to the purchasers, the latter could have recovered possession of the property in an action of unlawful detainer. Code, section 5445; Burks' Pleading and Practice (3d Ed.), sec. 105, p. 208; *Olinger* v. *Shepherd,* 12 Gratt. (53 Va.) 462, 471.

Since the purchasers were in a position, upon the confirmation of the sale in 1923, to protect their title and interest in the property by appropriate proceedings, we think the statute of limitations commenced to run against them at that time. To hold that the statute was suspended from the date of the foreclosure sale in 1923 until the delivery of the deed in 1933, would reward the purchasers at the judicial sale for their negligence in not perfecting their legal title to the property, either by recording the deed which had been delivered to them, or by demanding a deed if none had, in fact, been delivered.

Whatever, then, may have been the situation before the foreclosure proceedings, and whatever may have been the character of the original possession of the defendant's predecessor in title, whether with the permission of or hostile to

the railway company (the mortgagor),—we think that
from the time the purchasers at the foreclosure sale be-
came entitled to a deed, the possession of the defendant's
predecessor in title was hostile and adverse to such pur-
chasers, and the statute of limitations began to run against
the latter at that time.

The next question to be determined is, was the possession
of the defendant's predecessor in title for the statutory pe-
riod under a claim of right?

■ "The terms 'claim of right,' 'claim of title,' and 'claim
of ownership,' when used in connection with adverse pos-
session, mean nothing more than the intention of the dis-
seisor to appropriate and use the land as his own to the
exclusion of all others, irrespective of any semblance or
shadow of actual title or right." 1 Am. Jur., p. 897, sec.
187; *Guaranty Title & Trust Corp.* v. *United States,* 264 U.
S. 200, 44 S. Ct. 252, 68 L. Ed. 636.

In *Sims* v. *Capper,* 133 Va. 278, 287, 112 S. E. 676, 679,
this court said: "The claim of title need not be expressed;
it may be inferred from conduct which is unequivocal, and
is inconsistent with any other reasonable inference, * * * ."

■ "To establish claim of right as a requisite element of
adverse possession it is not necessary that the party in
possession should have expressly declared his intention
to hold the property as his own, nor need his claim thereto
be a rightful or well-founded one. That his acts and con-
duct clearly indicate a claim of ownership is enough, and it
may be sufficient even though the disseisor has knowledge
of a better title. The actual occupation, use, and improve-
ment of the premises by the claimant, as if he were in fact
the owner thereof, without payment of rent, or recognition
of title in another, or disavowal of title in himself, will be
sufficient to raise a presumption of his entry and holding
as absolute owner, and, unless rebutted, will establish the
fact of a claim of right." 1 Am. Jur., pp. 897-8, sec. 189.

■ Whether the acts relied on are sufficient to prove a
claim of title is a question for the jury. *Radford Veneer*

*Corp.* v. *Jones,* 143 Va. 124, 128, 129 S. E. 260; *Lee* v. *County School Board,* 146 Va. 804, 810, 132 S. E. 863.

Applying these principles, we think the evidence taken upon a demurrer thereto is sufficient to show that the defendant and those through whom it claims have been in possession of the property under a claim of right or claim of ownership.

As we have already seen, possession of that portion of the property from which the freight station was removed commenced under a parol contract between the president of the railway company and C. C. Lincoln, president of Virginia Table Company, through whom the defendant claims. Upon the performance of its part of the contract, the table company took immediate possession of the property, and it and its successors in title have held it since that time and have treated it as their own. Despite the fact that the parol contract for the conveyance of the land may have been unenforceable, and despite the further fact that the mortgage on the property might have precluded the railway company from conveying a clear title to the land, yet such contract was, we think, evidence of the fact that the table company entered upon and held the land under a *bona fide* claim of right and claim of ownership in itself.

As it is said in *Shanks* v. *Lancaster,* 5 Gratt. (46 Va.) 110, 120, 50 Am. Dec. 108, it is "immaterial whether an adversary possession under a claim of title, be under a good or a bad, a legal or an equitable title." Nor must a claim of title (as distinguished from color of title) be based on writing. *Kincheloe* v. *Tracewells,* 11 Gratt. (52 Va.) 587, 605; 2 Minor on Real Property (2d Ed.), pp. 1232-3, sec. 965, and cases there cited.

The record is silent as to the circumstances under which the defendant's predecessor in title took possession of the southern portion of the land in controversy. But the evidence does show that, in 1906 or 1907, those through whom the defendant claims erected valuable improvements upon this portion of the land, and ever since then have openly, notoriously, exclusively, and continuously carried on exten-

sive manufacturing operations there. This had been done for nearly thirty years before this suit was instituted, in plain and under close view of those who held legal title to the land. It is incredible that any sane business man or men would have built and operated a valuable factory upon land which they did not honestly believe was owned by him or them.

On the whole our conclusion is that the defendant and those through whom it claims have acquired title by adverse possession to the property in controversy.

The view we have taken of the matter makes it unnecessary that we decide the further interesting question discussed in the briefs as to whether, under the reasoning in *McClanahan's Adm'r* v. *Norfolk & Western Ry. Co.*, 122 Va. 705, 96 S. E. 453, there can be adverse possession by one claiming through a vendee of a mortgagor, against one who claims under the mortgagee.

The judgment is

*Affirmed.*